UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

PHELICIA TANNER,

                               Plaintiff,

    -against-                                       1:15-CV-0098 (LEK/CFH)

HEATH GRAPHICS LLC, *et al.*,

                                 Defendants.

## MEMORANDUM-DECISION AND ORDER

**I.    INTRODUCTION**

This case returns to the Court on defendant Mabeg Systems GmbH's second motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). Dkt. No. 43 ("Motion"). In a previous order, this Court denied Mabeg's first motion to dismiss for lack of personal jurisdiction and insufficient service of process and allowed plaintiff Phelicia Tanner to conduct jurisdictional discovery. Dkt. No. 38 ("March Order") at 1. After discovery closed, Mabeg filed the pending Motion, to which Tanner—together with defendant and cross-claimant Heath Graphics LLC—responded. Dkt. Nos. 54 ("Heath Response"), 56-7 ("Tanner Response"). Mabeg then filed a reply. Dkt. No. 59-1 ("Reply"). For the following reasons, the Court grants Mabeg's motion.

## II. BACKGROUND[1]

Tanner is a resident of Corinth, New York. Dkt. No. 1 ("Complaint") ¶ 1. Heath Graphics is a corporation organized under the laws of the State of Washington; its principal place of business is in King County, Washington. Id. ¶¶ 6, 8. Mabeg is a foreign corporation organized under the laws of Germany, and it maintains its principal and sole place of business in Mörfelden-Walldorf, Germany. Id. ¶¶ 16–17; Dkt. No. 19-2 ("Grübel Affidavit") ¶ 2.[2] Tanner conclusorily asserts that both Defendants were authorized to and did conduct and transact business within the State of New York. Compl. ¶¶ 9–10, 18–19.

Tanner was employed at Web/Graphics/Amsterdam Printing ("Web Graphics") in Queensbury, New York. Id. ¶ 38. On January 30, 2012, Tanner was injured while working with a Heath Sheet-fed Microcheck Press, which is a device used to print checks in industrial settings. Id. ¶¶ 35, 39, 41. Tanner was attempting to adjust the device's air pressure using an air valve located on the device when her left thumb became caught in a moving part. Id. ¶¶ 40–41. As a result of the injury, Tanner's left thumb had to be amputated. Id. ¶ 48. She also suffered disfigurement, nerve damage, and Complex Regional Pain Syndrome. Id.

---

[1] Because this matter is before the Court on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), the allegations of the Complaint are accepted as true. See Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala, 989 F.2d 572, 580 (2d Cir. 1993) ("The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits. If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor." (quoting Taylor v. Phelan, 912 F.2d 429, 431 (10th Cir. 1990) (per curiam))).

[2] Mabeg submitted the Affidavit of Michael Grübel in support of its first motion to dismiss. Grübel Aff. Grübel is Mabeg's Chief Financial Officer. Id. ¶ 1.

Heath Graphics designs, develops, and manufactures the Heath Sheet-fed Microcheck Press. Id. ¶¶ 26–29. Heath Graphics is also responsible for the assembly, inspection, repair, distribution, and sale of its machines. Id. ¶¶ 30–34. Tanner alleges that Heath Graphics sold a Heath Sheet-fed Microcheck Press to Web Graphics. Id. ¶¶ 37–38.

Mabeg is a German corporation that operates in the "planning, design, manufacture and sale of machinery, components and equipment, in particular for the graphic industry and the general mechanical and plant engineering." Grübel Aff., Ex. A. Tanner alleges that Mabeg designed, engineered, developed, manufactured, assembled, inspected, repaired, distributed, and/or sold the Heath Sheet-fed Microcheck Press and/or some component parts thereof. Compl. ¶ 136. In support of this assertion, Tanner submits a photograph of the identification plate adhered to the printing press that caused Tanner's injuries, which shows that the machine was manufactured by Mabeg Maschinenbau GmbH & Co. KG. Dkt. No. 29-23. Tanner contends that Mabeg sold, supplied, or provided the Heath Sheet-fed Microcheck Press or some of its component parts to Heath Graphics, which then sold the device to Web Graphics. Compl. ¶ 138.

Mabeg was founded on February 25, 2010. Grübel Aff. ¶ 3. Mabeg contends that it has never delivered or sold a Microcheck Press or a similar product to Heath Graphics in the State of Washington or to any other state in the United States. Id. ¶ 6. Mabeg contends that it is impossible for Mabeg to have manufactured the device at issue in this case or its component parts because Mabeg was not in existence at the time when the machine would have had to have been manufactured prior to Tanner's injury. Id. ¶ 7. But in its response to one of Tanner's

interrogatories, Mabeg stated that it had sold three items to Heath Graphics since 2010. Dkt. No. 43-1 ("Grogan Affidavit") Ex. B, at 8.[3] Mabeg did not say what these items were. Id.

Grübel asserts that he is aware of another company that manufactured sheet feeders "identical to the product described in the Complaint" called "Mabeg Maschinenbau GmbH & Co.KG," which was dissolved after undergoing bankruptcy proceedings in Germany several years ago. Id. ¶¶ 8–9. He contends that although Mabeg has used "the historically valuable name 'Mabeg'" since 2010, it has not assumed by contract or otherwise the liabilities of Mabeg Maschinenbau GmbH & Co.KG or any other company. Id. ¶ 10.

Grübel states that Mabeg has never been incorporated or authorized to do business in New York, nor has it sought the privilege of doing so. Id. ¶¶ 11–12. Mabeg does not maintain any offices, warehouses, or places of business, nor does it lease, rent, or control any real estate in New York. Id. ¶¶ 13, 25. Mabeg does not employ any officers or agents in New York. Id. ¶ 14. Grübel further states that Mabeg does not solicit business, advertise, or otherwise participate in the sale, purchase, distribution, resale, or service of any goods in New York State. Id. ¶¶ 15–17; Grogan Aff. Ex. B, at 6. Mabeg has never contracted with any New York entity to complete any work or project in New York. Grübel Aff. ¶ 18. Additionally, Mabeg does not have a mailing address, telephone listing, or bank account in New York, nor has it ever paid any taxes in New York. Id. ¶¶ 20–21, 23–24.

Mabeg entered into an exclusive agency agreement with TM Design & Engineering, LLC ("TMDE") in April 2011. Dkt. No. 29-15 ("Alio Affidavit Exhibit H") at 1. TMDE is based in Wisconsin, id. at 2, and under the agreement, which became effective on May 1, 2011, TMDE

---

[3] The page numbers for this exhibit come from the bottom-right of the pages.

would serve as the exclusive distributor of Mabeg's products in the United States, id.; Heath Resp. at 14. TMDE would also "advertis[e] Mabeg products, mak[e] calls on potential clients, [and] support customer service for specific products as requested by Mabeg." Heath Resp. at 14. In responding to one of Tanner's interrogatories, Mabeg said it had "sold numerous items to TM Design and Engineering since its inception in 2010." Grogan Aff. Ex. B, at 9. Mabeg did not describe these items. Id.

Mabeg has international reach. In 2012, Mabeg's sales to the United States accounted for 1.72% of total sales, 61.55% of sales involved German, Swiss, or Austrian entities, and the remainder involved thirty-eight other countries. Id. at 13. In 2013, Mabeg's United States sales accounted for 3.44% of total sales, its German, Swiss, and Austrian sales accounted for 55.65%, and the remainder went to forty-five other countries. Id. at 14. In 2014, 7.58% of Mabeg's sales were made in the United States, 72.08% were made in Germany and Switzerland, and the remainder went to forty-four other countries. Id. at 15. Finally, in 2015, Mabeg's United States sales accounted for 1.74% of total sales, 76.18% of sales went to German and Swiss entities, and the remainder involved forty-six other countries. Id. at 17.

The origins of the machine (or its component parts) that injured Tanner remain unclear. Tanner notes that she "is unable to produce facts to ascertain the chain of sale of the subject machine press; if it was manufactured specifically for [Tanner's] former employer in New York State; and how it made its way into New York." Tanner Resp. at 7. She blames Mabeg for this, suggesting that its discovery responses on this and other points were inadequate. Id. at 6. As noted above, Tanner's Complaint alleges that Mabeg sold the machine (or its component parts) to Heath Graphics, which then sold it to Web Graphics. Compl. ¶ 138. It is at least possible that

5

Mabeg instead sold the relevant item to TMDE, which then sold it to Heath Graphics, which finally sold it to Web Graphics.[4] In any event, aside from the item that injured Tanner, there is no evidence (or allegation) that any Mabeg products have ended up in New York, though Mabeg's sales figures indicate that a not insubstantial portion of its products ended up somewhere in the United States from 2012 to 2015. Grogan Aff. Ex. B, at 13–17.

### III. LEGAL STANDARD

Where a party moves to dismiss an action for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of showing that the court has jurisdiction over the defendant. Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996). When ruling on a motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction, a court is not limited to considering "the four corners of the complaint." Phillips v. Reed Grp., Ltd., 955 F. Supp. 2d 201, 225 (S.D.N.Y. 2013). "[T]he Court may also rely on submitted affidavits and other supporting materials submitted in relation to the motion." Id. Where a court relies only upon the pleadings and supporting affidavits, a plaintiff need only make a prima facie showing of personal jurisdiction over a defendant. Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 165 (2d Cir. 2005); Cutco Indus., Inc. v. Naughton, 806 F.2d 361, 364 (2d Cir. 1986).

"A prima facie showing of jurisdiction 'does not mean that plaintiff must show only some evidence that defendant is subject to jurisdiction; it means that plaintiff must plead facts which, if

---

[4] Mabeg suggests that it is "undisputed" that TMDE had nothing to do with the item that caused Tanner's injury. Reply at 5. True, Heath Graphics and Tanner do not say TMDE was involved in the transactions surrounding the product at issue in this case, but the record fails to establish that TMDE did not play a role in these transactions.

true, are sufficient in themselves to establish jurisdiction.'" Tamam v. Fransabank Sal, 677 F. Supp. 2d 720, 725 (S.D.N.Y. 2010) (quoting Bellepointe, Inc. v. Kohl's Dep't Stores, Inc., 975 F. Supp. 562, 564–65 (S.D.N.Y. 1997)). Pleadings that assert only "conclusory non-fact-specific jurisdictional allegations" or state a "legal conclusion couched as a factual allegation" do not meet this burden. Jazini v. Nissan Motor Co., 148 F.3d 181, 185 (2d Cir. 1998). While a court should assume the truth of all well-pleaded factual allegations that support a finding of personal jurisdiction, Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990), it should "not draw 'argumentative inferences' in the plaintiff's favor," Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994) (quoting Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 198 (2d Cir. 1992)).

## IV. DISCUSSION

### A. Personal Jurisdiction

In determining whether it may exercise personal jurisdiction, the Court must engage in a two-part inquiry. "First, it must determine whether the plaintiff has shown that the defendant is amenable to service of process under the forum state's laws; and second, it must assess whether the court's assertion of jurisdiction under these laws comports with the requirements of due process." Metro. Life, 84 F.3d at 567. New York law provides two bases for personal jurisdiction: New York Civil Practice Law and Rules ("N.Y. C.P.L.R.") 301, which authorizes general jurisdiction, and N.Y. C.P.L.R. 302(a), which authorizes long-arm jurisdiction.

The Court focuses on the applicability of N.Y. C.P.L.R. 302(a)(3)(ii), since it offers the only promising avenue for personal jurisdiction over Mabeg. N.Y. C.P.L.R. 302(a)(3)(ii) provides personal jurisdiction over a non-resident who "commits a tortious act without the state

7

causing injury to person or property within the state" where she "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." Jurisdiction under N.Y. C.P.L.R. 302(a)(3)(ii) therefore depends on four elements: "(1) defendant committed a tortious act outside the state, (2) defendant's tortious activity caused injury to a person within the state, (3) defendant should reasonably have expected the act to have consequences in the state, and (4) defendant derives substantial revenue from interstate or international commerce." Cortlandt Racquet Club, Inc. v. Oy Saunatec, Ltd., 978 F. Supp. 520, 523 (S.D.N.Y. 1997).

Mabeg concedes that the third element—whether it should reasonably have expected its allegedly tortious act to have consequences in New York—is the "only one . . . seriously at issue on this motion." Dkt. No. 59-1 ("Memorandum") at 6. The tortious act here is the production, in Germany, of the allegedly defective item that caused Tanner's injuries, and there is little question that Mabeg obtains significant revenue from international commerce. While it is still unclear that Mabeg in fact built the item in question, Mabeg has not suggested in its latest series of filings that it was not responsible for the product. Thus, the Court will assume, for purposes of this Motion, that Mabeg produced the item. The question, then, is whether Mabeg could reasonably foresee that its act of producing the allegedly defective item would have consequences in New York.

"The test of whether a defendant expects or should reasonably expect his act to have consequences within the State is an objective rather than a subjective one." Allen v. Auto Specialities Mfg., Co., 357 N.Y.S.2d 547, 550 (App. Div. 1974). "Moreover, the statutory requirement of foreseeability relates to forum consequences generally and not to the specific

event which produced the injury within the State." Id. But "mere foreseeability of in-state consequence and failure to avert that consequence is not sufficient to establish personal jurisdiction under New York's long-arm statute." Cortlandt Racquet Club, 978 F. Supp. at 523. "There must be 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protection of its laws.'" Martinez v. Am. Standard, 457 N.Y.S.2d 97, 99 (App. Div. 1982) (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)). This assumes "a discernible effort, by the manufacturer or distributor, to serve, directly or indirectly, a market in the forum state." Darienzo v. Wise Shoe Stores, Inc., 457 N.Y.S.2d 831, 834 (App. Div. 1980).

As noted above, the record does not disclose how the item that caused Tanner's injuries got to Web Graphics, Tanner's employer. Suppose Mabeg sold it to Heath Graphics, which then sold it to Web Graphics. Heath Graphics is a Washington limited-liability company whose principal place of business is in Washington. Compl. ¶¶ 6–8. Unfortunately, the Court knows almost nothing else about Heath Graphics. Tanner describes Heath Graphics as "a distributor of Mabeg products," Tanner Resp. at 4, but Mabeg stated in its response to one of Tanner's interrogatories that it had sold only three products to Heath Graphics since 2010, Grogan Aff. Ex. B, at 8, and there is no other evidence suggesting that Heath Graphics acted as a distributor for Mabeg products in the United States.

Even if one of the three products sold to Heath Graphics were the defective item at issue, that would not be enough to show that Mabeg could reasonably expect its tortious act to have effects in New York. Again, there is simply no evidence that Mabeg knew that Heath Graphics, a Washington entity, would sell any Mabeg products in New York. For all the Court knows at this

9

point, Heath Graphics might never have served as a distributor for Mabeg products. Heath Graphics might have simply purchased a few Mabeg products for its own purposes, realized that the products did not meet their needs, and then resold them to Web Graphics. Thus, the Court cannot say that Mabeg should have reasonably expected that its production of the defective item for sale to Heath Graphics would have effects in New York. That in turn means the Court cannot exercise long-arm jurisdiction over Mabeg based on this understanding of the supply chain.

But long-arm jurisdiction would be appropriate if Mabeg sold the defective item to TMDE, which then sold it to Heath Graphics, which finally sold it to Web Graphics. If there were evidence to support this chain of sale—which at present there is not—then Kernan v. Kurz-Hastings, Inc., 175 F.3d 236 (2d Cir. 1999), would require this Court to exercise long-arm jurisdiction over Mabeg. In Kernan, the plaintiff suffered injuries while "operating a hot stamping press at Forbes Products Corporation in Dansville, New York." 175 F.3d at 239. Kurz-Hastings, a Pennsylvania corporation, had sold the press to Forbes. Id. After the plaintiff sued Kurz-Hastings, it filed a third-party complaint against Navitas Co., Ltd., "the Japanese manufacturer of the press in question that sold and shipped the press to Kurz-Hastings." Id. Navitas did not transact any business in New York. Id. It did have an exclusive sales agreement with Kurz-Hastings, which was to act as Navitas's United States distributor, but Navitas did not know where in the United States any of its presses would end up. Id. The defective machine was sold to Forbes under the agreement between Navitas and Kurz-Hastings. Id. at 239–40. This machine was the only identifiable one sold in New York during the relevant period. Id. The court, applying N.Y. C.P.L.R. 302(a)(3)(ii), held that Navitas could reasonably foresee that its production of the defective machine would lead to consequences in New York. Id. at 242. The

Court reasoned that "Navitas did indeed attempt to serve the New York market, even if it did so indirectly," and the fact "that the agreement did not specify New York, but instead . . . permitted the sale of Navitas's . . . presses throughout the world, cannot serve to defeat jurisdiction." Id.

Here, under the second possible version of the supply chain, the defective item was ultimately sold to Web Graphics as a result of TMDE's exclusive sales agreement with Mabeg. That agreement required TMDE to act as the exclusive United States distributor for Mabeg products. Heath Resp. at 14. While the agreement did not specifically mention New York, that is not enough to defeat jurisdiction under Kernan. 175 F.3d at 242. It is sufficient that TMDE was the exclusive Mabeg distributor in the United States. See Stone v. Ranbaxy Pharm., Inc., No. 10-CV-8816, 2011 WL 2462654, at *4 (S.D.N.Y. June 16, 2011) (finding personal jurisdiction on the ground that "[t]he exclusive relationship between Ranbaxy Lab and Ranbaxy Pharm echoes the relationship between the Japanese manufacturer and American distributor in Kernan"). Thus, assuming the truth of this version of the supply chain, the Court could exercise long-arm jurisdiction over Mabeg under N.Y. C.P.L.R. 302(a)(3)(ii).[5]

Yet that does not end the inquiry. Even if the Court could exercise long-arm jurisdiction over Mabeg under this theory, it would still need to "assess whether [its] assertion of jurisdiction [would] comport[] with the requirements of due process." Metro. Life, 84 F.3d at 567. In order for an exercise of jurisdiction to comport with due process, it must satisfy both a "minimum contacts" test and a "reasonableness" inquiry. Id. "With respect to minimum contacts, [the court] must determine whether the defendant has sufficient contacts with the forum state to justify the

---

[5] Kernan would not help Tanner establish long-arm jurisdiction if Mabeg sold the defective item to Heath Graphics, which later sold it to Web Graphics, because there is no evidence (or allegation) that Heath Graphics had any kind of distribution agreement with Mabeg.

court's exercise of personal jurisdiction." Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 156, 164 (2d Cir. 2010). "The minimum contacts test asks whether a defendant has engaged in 'purposeful availment'—that is, whether the contacts indicate the defendant's intent to invoke the benefits and privileges of New York law." Weisblum v. Prophase Labs, Inc., 88 F. Supp. 3d 283, 289 (S.D.N.Y. 2015). Further, "the claim [must] arise[] out of or relate[] to the defendant's contacts with the forum." Jonathan Adler Enters., LLC v. Ins & Outs Pottery, Inc., No. 12-CV-4866, 2012 WL 4471540, at *1 (S.D.N.Y. Sept. 26, 2012).

Kernan held that the "'exclusive sales rights' agreement [in question] constitutes the type of purposeful action sufficient to support a finding of minimum contacts." 175 F.3d at 244. The court argued that "the 'exclusive sales rights' agreement, which contemplates that Kurz–Hastings will sell Navitas's machines in North America and throughout the world, serves as evidence of Navitas's attempt to serve the New York market, albeit indirectly." Id. at 243. And it held that the "reasonableness" factors "weigh in favor of exercising jurisdiction." Id. It would seem, then, that this Court could exercise long-arm jurisdiction over Mabeg without violating due process—assuming again that Mabeg sold the defective item under its exclusive sales agreement with TMDE.

But not so fast. Kernan was decided in 1999, twelve years before the Supreme Court's decision in J. McIntyre Machinery Ltd., v. Nicastro, 564 U.S. 873 (2011). Nicastro involved facts that are strikingly similar to those in Kernan. The plaintiff "seriously injured his hand while using a metal-shearing machine manufactured by J. McIntyre Machinery, Ltd." Id. at 878. The injury happened in New Jersey, "but the machine was manufactured in England, where J. McIntyre is incorporated and operates." Id. J. McIntyre did not market or ship any goods to New Jersey, but

12

"an independent company agreed to sell J. McIntyre's machines in the United States." Id. Also, "J. McIntyre officials attended annual conventions for the scrap recycling industry to advertise J. McIntyre's machines alongside the distributor," but none of the conventions took place in New Jersey. Id. Finally, at most four, and perhaps only one, of J. McIntyre's machines ended up in New Jersey. Id.

No single opinion garnered five votes, but six Justices agreed that the assertion of personal jurisdiction over J. McIntyre on these facts violated due process. See Williams v. Romarm, SA, 756 F.3d 777, 784 (D.C. Cir. 2014) ("[S]ix justices [in Nicastro] agreed the forum state could not constitutionally assert personal jurisdiction over the foreign manufacturer . . . ."). Three Justices joined Justice Kennedy's opinion, which stated that "[t]he defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State." Nicastro, 564 U.S. at 882. Justice Kennedy found that J. McIntyre had not "engaged in conduct purposefully directed at New Jersey." Id. at 886. Justice Breyer's concurrence, which was joined by Justice Alito, rejected the "rule of broad applicability" set out in Justice Kennedy's plurality opinion. Id. at 887 (Breyer, J., concurring). Yet Justice Breyer agreed with the plurality opinion's bottom line, stating that "Nicastro failed to meet his burden to demonstrate that it was constitutionally proper to exercise jurisdiction over . . . J. McIntyre." Id. He differed from Justice Kennedy in finding that "the outcome of this case is determined by our precedents." Id.

"When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken

13

by those Members who concurred in the judgments on the narrowest grounds." Marks v. United States, 430 U.S. 188, 194 (1977) (internal quotation marks omitted). Under the Marks rule, then, "Justice . . . Breyer's concurrence in Nicastro controls." Ikeda v. J. Sisters 57, Inc., No. 14-CV-3570, 2015 WL 4096255, at *7 (S.D.N.Y. July 6, 2015); accord Ainsworth v. Moffett Eng'g, Ltd., 716 F.3d 174, 178 (5th Cir. 2013) ("In Nicastro, Justice Breyer's concurring opinion, joined by Justice Alito, furnished the narrowest grounds for the decision and controls here."); AFTG-TG, LLC v. Nuvoton Tech. Corp., 689 F.3d 1358, 1363 (Fed. Cir. 2012) ("The narrowest holding [in Nicastro] is that which can be distilled from Justice Breyer's concurrence . . . ."). Indeed, it is hard to imagine a more straightforward application of Marks: Justice Breyer concurred in the plurality opinion's result, but he preferred to stick to the Court's precedents, finding that the case was "an unsuitable vehicle for making broad pronouncements that refashion basic jurisdictional rules." Nicastro, 564 U.S. at 890 (Breyer, J., concurring).

So what does this mean for Kernan and the present case? In his controlling opinion, Justice Breyer noted that "[n]one of our precedents finds that a single isolated sale, even if accompanied by the kind of sales effort indicated here, is sufficient." Id. at 888. Indeed, "a single sale of a product in a State does not constitute an adequate basis for asserting jurisdiction over an out-of-state defendant, even if that defendant places his goods in the stream of commerce, fully aware (and hoping) that such a sale will take place." Id. at 888–89. Justice Breyer suggested that additional facts—such as a "regular flow" or "regular course" of sales in New Jersey, or "special state-related design, advertising, advice, marketing, or anything else"—may have made the exercise of personal jurisdiction over J. McIntyre constitutionally proper. Id. at 889; accord Williams, 756 F.3d at 785 (holding that Nicastro requires that "at a minimum, a plaintiff trying to

14

establish personal jurisdiction over a foreign corporation must show a 'regular flow or regular course of sales' in the forum state, or some additional efforts directed toward the forum state, such as 'special state-related design, advertising, advice, [or] marketing'" (alteration in original) (quoting Nicastro, 564 U.S. at 889)). But those additional facts were missing from the record. Nicastro, 564 U.S. at 889.

Recall that in Kernan, the record disclosed only one sale in New York. 175 F.3d at 239–40. There was also no indication that Navitas, the Japanese manufacturer, engaged in "special state-related design, advertising, advice, [or] marketing." Nicastro, 564 U.S. at 889. Yet the Second Circuit found that personal jurisdiction over Navitas could be exercised without offending due process. Kernan, 175 F.3d at 245. Thus, Kernan's holding on this score conflicts with Justice Breyer's concurrence in Nicastro and is no longer good law. See Oscar G. Chase & Lori Brooke Day, Re-Examining New York's Law of Personal Jurisdiction After Goodyear Dunlop Tires Operations, S.A. v. Brown and J. McIntyre Machinery, Ltd. v. Nicastro, 76 Alb. L. Rev. 1009, 1046 (2012–2013) (noting that, in light of Nicastro, "[p]erhaps the most troubling precedent for New York courts is a Second Circuit case, Kernan v. Kurz-Hastings, Inc."). And if Nicastro means that Kernan is no longer good law on this issue, it also means that this Court could not constitutionally exercise personal jurisdiction over Mabeg even if—as is far from clear on the record before the Court—the defective item were first sold to TMDE under the exclusive sales agreement. That is because Mabeg is just like J. McIntyre in this scenario: there was only one documented sale to New York, that sale took place under a nationwide distribution

agreement that did not explicitly target New York, and there is no indication that Mabeg engaged in any New York-focused activities.[6]

To sum up, on the record as it stands, the Court cannot exercise personal jurisdiction over Mabeg. If the defective item were sold to Heath Graphics and then to Web Graphics, Tanner and Heath Graphics could not show that Mabeg reasonably expected its production of the defective product to have effects in New York under N.Y. C.P.L.R. 302(a)(3)(ii), because the Court knows next to nothing about Heath Graphics. It is a Washington entity to which Mabeg has sold three items since 2010, but several crucial questions remain unanswered: was it ever a distributor of those items, and if so, what was the geographic scope of that distribution network? Was it simply a purchaser of a few Mabeg items that it then resold to Heath Graphics when it decided it did not need them? Without information about the nature of Mabeg's relationship to Heath Graphics, the Court cannot exercise long-arm jurisdiction over Mabeg on this version of the supply chain. On the other hand, if the defective item were sold to TMDE under the exclusive sales agreement and then ultimately sold to Web Graphics, long-arm jurisdiction under N.Y. C.P.L.R. 302(a)(3)(ii) would be proper because of Kernan, but the assertion of jurisdiction on that ground would violate due process due to Nicastro absent additional information about other New York-related contacts on Mabeg's part.[7]

---

[6] The lack of any indication in the record that Mabeg, through TMDE, engaged in any New York-related conduct also explains why long-arm jurisdiction cannot be premised on N.Y. C.P.L.R. 302(a)(1), under which a court may exercise personal jurisdiction over a non-domiciliary that, in person or through its agent, "transacts any business within the state or contracts anywhere to supply goods or services in the state."

[7] Another possibility is that the defective item was sold to Heath Graphics, but that independently of that sale, Mabeg was simultaneously distributing its products under the exclusive sales agreement with TMDE. Even if TMDE had, with Mabeg's knowledge, targeted

**B. Discovery**

The Court has already ordered one round of jurisdictional discovery, but Tanner and Heath Graphics complain that Mabeg's responses to their discovery requests were evasive. Tanner Resp. at 11–16; Heath Resp. at 7–9. There is something to this. For example, Mabeg was asked to "[s]tate whether any contracts existed, or currently exist, which define any business relationship between [Mabeg] and TM[DE]." Grogan Aff. Ex. B, at 9. Mabeg responded in part by saying that "[a]s there is no assertion that TM[DE] is an entity either headquartered or formed in New York State, any relationship between the two entities is irrelevant to the question of whether [Mabeg] has sufficient ties to New York State to justify the exercise of personal jurisdiction." Id. That is simply not true. If TMDE and Mabeg had a distribution agreement that explicitly targeted New York for sales of Mabeg's products, that would strongly suggest minimum contacts with New York. The location of TMDE's headquarters would be largely irrelevant.

But it is far too late in the game for Heath Graphics and Tanner to ask the Court to remedy any deficiencies in Mabeg's discovery responses. Discovery in this case closed in July 2016. Neither Heath Graphics nor Tanner informed the Court of any problems with Mabeg's discovery responses until January 2017, when both parties filed their papers in opposition to Mabeg's Motion. Docket. The Second Circuit has held that a "district court did not abuse its

---

New York, Tanner and Heath Graphics would still fail to satisfy N.Y. C.P.L.R. 302(a)(3)(ii) if they could not provide information about Heath Graphics suggesting that Mabeg could reasonably expect that its production of the defective item for sale to Heath Graphics would have consequences in New York. That is because N.Y. C.P.L.R. 302(a)(3)(ii) "requires that it would have been foreseeable that the allegedly tortious act would have consequences in New York; not that it would have been foreseeable that other of the defendant's acts would have had consequences in New York." Cortlandt Racquet Club, 978 F. Supp. at 525.

discretion in denying [a] Plaintiff's motion to compel discovery, which was filed over one month after the close of discovery, as untimely." Richardson v. City of New York, 326 F. App'x 580, 582 (2d Cir. 2009). Here, Heath Graphics and Tanner waited over six months after discovery closed to bring to the Court's attention their issues with Mabeg's conduct during discovery. And neither Heath Graphics nor Tanner has explained why a motion to compel could not have been filed before discovery closed. See Matusick v. Erie Cty. Water Auth., No. 07-CV-489, 2010 WL 681062, at *2 (W.D.N.Y. Feb. 22, 2010) ("The Court declines to re-open discovery in this matter [because] the plaintiff has not demonstrated why the sought after discovery, or the instant motion [to compel], could not have been made in a timely manner."). Thus, the Court will not order additional discovery in this case.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Mabeg's Motion to Dismiss for Lack of Personal Jurisdiction (Dkt. No. 43) is **GRANTED**; and it is further

**ORDERED**, that the Clerk of the Court terminate Mabeg as a defendant in this case; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:    March 08, 2017
          Albany, New York

_Lawrence E. Kahn_
Lawrence E. Kahn
U.S. District Judge